**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**TREVELL ANTWON HARVEY,**

      Petitioner,

v.                                                                                   Civil Action No. **3:21CV304**

**HAROLD CLARKE,**

      Respondent.

**MEMORANDUM OPINION**

Trevell Antwon Harvey, a Virginia state prisoner proceeding by counsel, brings this amended petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition"). (ECF No. 8.) Respondent has moved to dismiss. (ECF No. 12.) Harvey has filed a Reply. (ECF No. 18.) For the reasons discussed below, the Motion to Dismiss will be GRANTED, and the § 2254 Petition will be DENIED.

## I.       PROCEDURAL HISTORY

A multi-jurisdictional grand jury sitting in the Circuit Court for the City of Richmond, Virginia ("Circuit Court") charged Harvey with first-degree murder, use of a firearm during the commission of murder, malicious wounding, and use of a firearm in the commission of the crime of malicious wounding. *See Commonwealth v. Harvey*, Nos. CR16F00810–00 through 813–00 (Va. Cir. Ct. Jan. 27, 2016) (Cir. Ct. Record 4).[1] The Commonwealth moved to nolle prosequi the

---

[1]       The Virginia state courts applied a continuous pagination to their records. The Court employs the pagination assigned by the Circuit Court to Harvey's criminal record with the abbreviation "Cir. Ct. Record," the Court of Appeals of Virginia with the abbreviation "CAVA Record," the Supreme Court of Virginia as "SCVA Record," and the Circuit Court habeas record as "Hab. Record."

malicious wounding and related firearm charge before trial. (*Id.* at 132.)[2] The jury found Harvey guilty of both first-degree murder and use of a firearm in the commission of murder and fixed his sentence as life imprisonment plus three years. (*Id.* at 46.) On August 18, 2016, the Circuit Court imposed the sentence fixed by the jury of life plus three years. (*Id.* at 80–81.)

Harvey filed a Motion to Set Aside the Verdict Based on Inherently Incredible Testimony Given by a Witness for the Commonwealth and a Motion to Set Aside the Verdict for Failure to Comply with Requirements of *Brady v. Maryland*. (*Id.* at 87–95.) Harvey argued that the Commonwealth's sole witness, Sherrelle Cheatham,[3] the victim's sister, provided inconsistent testimony that cast doubt on her identification of Harvey as the shooter (*id.* at 88–89), and that the Commonwealth failed to turn over unredacted versions of various police materials that would have also demonstrated that Sherrelle provided inconsistent testimony (*id.* at 91–95). The Circuit Court denied both motions. (*Id.* at 100.)

Harvey appealed. On appeal, Harvey argued that:

I.   The defense should have been given unredacted copies of the documents in question since they could have been used to impeach the Commonwealth's lone eyewitnesses.

II.   The Commonwealth's evidence failed to prove that Harvey was the person who shot and killed Jerquell Cheatham.

(CAVA Record 5.) On June 30, 2017, the Court of Appeals denied the petition for appeal. (*Id.* at 64–67.) The Court of Appeals summarized the evidence of Harvey's guilt as follows:

So viewed, the evidence proved that [Sherrelle's] brother, the victim, was shot on the dance floor of a night club. [Sherrelle] testified she arrived at the club

---

[2]   The Circuit Court also severed and continued proceedings for three additional felony firearm indictments, one of which was related to the present case and two which were from separate incidents. (Cir. Ct. Record 132, 521.) The Commonwealth eventually moved to dismiss all three.  (*Id.* at 521.)

[3]   To avoid confusion, this Court refers to Sherrelle Cheatham as "Sherrelle" and Jerquell Cheatham, the victim, as "Jerquell."

around 10:30 p.m. and appellant, whom she had known for about six months, arrived around midnight. The victim arrived about half an hour after appellant. While on the dance floor, [Sherrelle] saw someone tap the shoulder of a person standing next to her, motioning for that person to step back. [Sherrelle] then saw appellant pulling a bandana over his face while approaching the victim. [Sherrelle] alerted the victim, but appellant walked up to the victim and shot him in the back. [Sherrelle] testified she showed an officer a picture of appellant and told Detective Baynes that appellant was the shooter. Surveillance video captured appellant running from the dance floor after the shooting, removing a bandana from his face, and putting a firearm in the waistband of his pants.

Appellant testified at trial that he was at the club and that he was wearing a bandana as a fashion accessory. Appellant asserted that he obtained a firearm after he heard that others in the club were armed. Appellant denied shooting the victim and explained that he drew the weapon only when he heard shots fired.

The jury rejected appellant's testimony denying he shot the victim. "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702, 714 S.E.2d 212, 222 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509–10, 500 S.E.2d 233, 235 (1998)). "[D]etermining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact." *Parham v. Commonwealth*, 64 Va. App. 560, 565, 770 S.E.2d 204, 207 (2015). "The conclusions of the fact finder on issues of witness credibility 'may only be disturbed on appeal if this Court finds that [the witness'] . . . testimony was "inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Moyer v. Commonwealth*, 33 Va. App. 8, 28, 531 S.E.2d 580, 590 (2000) (*en banc*) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858, 406 S.E.2d 417, 419 (1991)). [Sherrelle]'s testimony was neither inherently incredible nor contrary to human experience. Therefore, this Court will not disturb the jury's credibility findings.

The evidence showed that [Sherrelle] had known appellant for six months prior to the murder. Immediately after the shooting, and at trial, [Sherrelle] unequivocally identified appellant as the person who shot her brother. Further, surveillance video memorialized appellant removing the bandana from his face and putting a firearm in his waistband while running from the dance floor immediately after the shooting. This evidence supports the finding that appellant committed the murder. Accordingly, the court did not err by denying the motions to strike and set aside the verdicts.

(*Id.* at 66–67.) On April 3, 2018, the Supreme Court of Virginia refused Harvey's petition for

appeal. (SCVA Record 30.)

On March 27, 2019, Harvey filed a petition for a writ of habeas corpus in the Circuit Court.

In his petition, Harvey raised the following claims for relief:[4]

Claim 1:       "Trial counsel, Jonathan M. O'Connor, failed to impeach Sherrelle's identification testimony by using evidence turned over by the Commonwealth, containing alleged statements by Sherrelle that contradicts her trial testimony that she identified Petitioner while at the club by showing a picture of him to an unidentified officer, which is not supported by the evidence turned over by the Commonwealth in discovery." (Hab. Record. 5.)

Claim 2:       "(a). Counsel failed to investigate and subpoena Officer Chasteen as a rebuttal witness, and for impeachment purposes, based on an email authored by Chasteen indicating that Sherrelle told her saw who shot the victim, but did not identify who she supposedly saw, and that she was uncooperative, where Sherrelle testified at trial to speaking with officers while still at the club and identifying Petitioner along with showing his picture to officers at the club." (*Id.* at 7.)

               "(b). To the extent that counsel may claim he did not know Sherrelle was the subject of the email, counsel nevertheless rendered deficient performance in failing to ask for a recess an[d] get Officer Chasteen in court once it was revealed that Sherrelle was the subject of Chasteen's redacted email." (*Id.* at 7.)

Claim 3:       "Counsel failed to impeach Sherrell's identification testimony by arguing that Sherrelle never mentioned anything about Petitioner wearing a bandana in her statements to police prior to her trial testimony." (*Id.* at 11.)

Claim 4:       "(a.) Counsel failed to investigate and discover the pending criminal charges against Sherrelle for malicious wounding at the time of her trial testimony to challenge the credibility and bias of Sherrelle's testimony." (*Id.* at 15.)

               "(b). Alternatively, counsel failed to argue *Brady* violations for the Commonwealth's failure to disclose Sherrelle's pending charges after it was discovered post-trial, but prior to Petitioner's motion to set aside the verdict." (*Id.* at 15.)

Claim 5:       "Counsel failed to impeach Sherrelle's identification testimony by arguing and presenting evidence to the jury that the wound trajectory pattern that the bullets took contradicts Sherrelle's testimony as to the way in which she witnessed the victim being shot." (*Id.* at 18.)

Claim 6:       "Counsel failed to impeach Sherrelle's identification testimony by arguing to the jury that the scientific evidence of stippling and soot deposition did not support

---

[4]       The Court corrects the punctuation, spelling, spacing, and capitalization, and removes the underlining and emphasis in the quotations from the parties' submissions.

Sherrelle's testimony that the gun was a foot and a half away from the victim at the time he was shot." (*Id.* at 20.)

Claim 7:     "Counsel failed to impeach the reliability of Sherrelle's identification by arguing that video footage evidence demonstrates that Petitioner entered the club with only one person, 'Cal,' then went up the steps to the right into the VIP area, contrary to Sherrelle's testimony that Petitioner arrived to the club with two individuals whom she identified as 'Cal' and 'DY' and then went bouncing down the steps onto the dance floor which is to the left entering the club." (*Id.* at 22.)

Claim 8:     "Counsel failed to impeach Sherrell's identification testimony by arguing that video footage evidence could have been used to argue that Sherrelle was not on the dance floor at the time of the shooting and therefore, she could not have witnessed the shooting." (*Id.* at 25.)

Claim 9:     "Trial/Appellate counsel rendered ineffective assistance in appeal of Petitioner's conviction for first-degree murder and use of a firearm by failing to adequately brief that the trial court erred in denying the Petitioner's motion to set aside the verdict based on a violation of the Commonwealth's duties pursuant to *Brady v. Maryland*, where several redacted documents, which were favorable and material to Petitioner's defense, were impermissibly withheld by the prosecution, and for allowing the Appellate courts to improperly rule that the Commonwealth gave the identity of the witness in both of the redacted documents mentioned in his brief, thereby precluding [appellate] review of Petitioner's claim by the courts." (*Id.* at 31.)

Claim 10:    "Counsel failed to impeach Sherrelle's identification testimony by investigating and subpoenaing alibi witnesses, for trial purposes and Petitioner's motion to set aside the verdict, by failing to contact the witnesses at all." (*Id.* at 40.)

Claim 11:    "Trial counsel was ineffective by failing to request a continuance of the trial, in order to subpoena alibi witnesses to be present and testify on Petitioner's behalf, after being requested to do so by the Petitioner." (*Id.* at 43.)

Claim 12:    "Counsel rendered ineffective assistance by forcing Petitioner to testify, and telling the jury in opening arguments that the Petitioner had a gun without consulting Petitioner, and preparing him to testify accordingly, thus, forcing Petitioner to testify unprepared in violation of Petitioner's right not to not testify." (*Id.* at 44.)

Claim 13:    "Counsel failed to present and argue [the] claim that the Commonwealth violated Petitioner's statutory [right] to a preliminary hearing, thereby precluding the Petitioner from addressing the claim on direct appeal." (*Id.* at 46.)

On November 1, 2019, the Circuit Court denied Harvey's habeas petition. (*Id.* at 276.) Harvey

appealed to the Supreme Court of Virginia and raised the following assignments of error:

1)      The Circuit Court erred in denying Appellant's petition for a writ of habeas corpus, in that the Court denied Appellant's habeas corpus petition based upon a pleading filed by counsel for the Respondent to Appellant's petition for a writ of habeas corpus, without any further hearing or proceedings.

2)      The Circuit Court erred in denying Appellant's petition for writ of habeas corpus, in regards to counsel's ineffective assistance of counsel, in ruling that defense counsel's representation met the required standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984).

(ECF No. 14–1, at 7.) On December 8, 2020, the Supreme Court of Virginia refused the petition for appeal. (*Id.* at 47.) On February 4, 2021, the Supreme Court of Virginia denied a petition for rehearing. (*Id.* at 55.)

On May 12, 2021, Harvey filed the present § 2254 Petition. (ECF No. 8.) In his § 2254 Petition, Harvey indicates that he has only one "CLAIM FOR RELIEF." (*Id.* at 9.) However, this statement does not accurately reflect Harvey's claims, as Harvey clearly has asserted two distinct claims, each with multiple subparts.[5] For the benefit of clarity and to analyze fully Harvey's claims, the Court has parsed the § 2254 Petition and restates the claims as follows:

---

[5]      Rule 2(d) of the Rules Governing Section 2254 Cases provides that an application for relief under § 2254 "must substantially follow either the form appended to these rules or a form prescribed by a local district-court rule." Rules Governing Section 2254 Cases, R. 2(d). Moreover, in the United States District Court for the Eastern District of Virginia, all *pro se* petitions for writs of habeas corpora must be filed on a set of standardized forms. *See* E.D. Va. Loc. Civ. R. 83.4(A). "Counsel filing a petition for writ of habeas corpus need not use a standardized form, but any petition *shall contain* essentially the same information as set forth on said form." *Id.* (emphasis added). A *pro se* litigant or an attorney proceeding in this district is required to follow the rules of procedure. *See Davidson v. Johnson*, No. 3:08CV406, 2008 WL 4159737, at *2 (E.D. Va. Sept. 9, 2008).

The standardized form for filing a § 2254 petition, or "PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY" ("standardized form"), requires that the petitioner set forth each level of appeal he pursued, and the grounds for appeal raised therein, and any post-conviction petitions he may have filed, the grounds raised therein, and the result of any proceeding. Rules Governing Section 2254 Cases, Appendix of Forms ¶¶ 8–11. The standardized form also requires the inmate to set forth each claim of his petition and then, for each claim, "state the specific facts that support your claim." *Id.* ¶ 12. Additionally, for each claim, the instructions require the inmate to provide "the specific facts that support your claim," an explanation for why the inmate did not exhaust his claim in state court, and identify exactly when and where in state court the inmate raised each individual claim and the

Claim One:    "Trial counsel was ineffective at trial under the Sixth Amendment to the United States Constitution in failing to prepare for trial, effectively cross-examine [Sherrelle], present evidence and call witnesses in Harvey's favor. (Attachment 1, State habeas claims 1–4, 7, 8 & 10)." (ECF No. 8, at 9.) Specifically, counsel:

    (a) failed to impeach [Sherrelle] with her prior statements (*id.*);

    (b) failed to impeach [Sherrelle] with her pending malicious wounding charge (*id.* at 11);

    (c) failed to contradict [Sherrelle] with videos; (*id.* at 13); and,

    (d) failed to contradict [Sherrelle] with witnesses (*id.* at 14).

Claim Two:    "The state habeas decision was an unreasonable determination of the facts and contrary to or an unreasonable application of Supreme Court law" because:

    (a) "[t]he state court adopted wholesale the order written by counsel for the warden without alerting Harvey it was doing so" (*id.* at 16);

    (b) the state court ruled on the petition without permitting Harvey discovery or an evidentiary hearing (*id.* at 19); and,

    (c) the state court failed to consider that "Harvey was prejudiced by the cumulative errors of trial counsel." (*id.* at 20).

## II.    ANALYSIS OF CLAIM TWO

The Court begins its analysis with Claim Two. For the reasons that follow, the Court dismisses Claims Two (a), (b), and (c) because the claims assert errors occurring in a state post-conviction proceeding, which cannot serve as a basis for federal habeas corpus relief. Additionally, even if stating a cognizable claim, Claim Two (a) and (c) are also barred from review.

---

result of that filing. *Id.* An inmate must complete a separate section for each "GROUND" or claim he wishes to raise. Next, after an inmate sets forth his claims, he must identify whether "all grounds for relief that [he] raised in this petition [have] been presented to the highest state court having jurisdiction" and if they have not, the inmate must identify "which grounds have not been so presented and give [his] reasons(s) for not presenting them." *Id.* ¶ 13.

Harvey's § 2254 Petition fails to comply with these rules. While Harvey was permitted to choose his own format, he failed to include the information required by the form, and importantly failed to delineate information by claim. Harvey's failure to set forth clear claims for relief has unnecessarily complicated the Court's determination of the claims he intends to raise in his § 2254 Petition, and its review of whether Harvey raised each of his claims in the state court.

Additionally, Harvey did not swear under penalty of perjury that the information in his § 2254 Petition was "true and correct" as required by the standardized form. Rather, he swore that "[t]he facts stated therein are true to the best of my information and belief." (ECF No. 8, at 23.) *Cf. Walker v. Tyler Cnty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001) (treating such a verification as insufficient to make contents more than pleading allegations).

### A.    Claims Two (a), (b), and (c) are Not Cognizable in Federal Habeas

In Claims Two (a), (b), and (c), Harvey contends that the Circuit Court made several errors with respect to his state habeas petition, including that it adopted a Final Order drafted by the Respondent, failed to provide Harvey discovery or an evidentiary hearing, and failed to examine Harvey's ineffective assistance of counsel claims properly. (*See* ECF No. 8, at 16–20.) In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, "claims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief." *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988) (emphasis omitted) (citations omitted). This is so because the habeas petitioner's detention results from the underlying state conviction, not the state collateral proceeding. *Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) ("[E]ven where there is some error in state post-conviction proceedings, a petitioner is not entitled to federal habeas relief because the assignment of error relating to those post-conviction proceedings represents an attack on a proceeding collateral to detention and not to the detention itself." (citing *Bryant*, 848 F.2d at 493; *Bell–Bey v. Roper*, 499 F.3d 752, 756 (8th Cir. 2007); *United States v. Dago*, 441 F.3d 1238, 1248 (10th Cir. 2006))). Harvey's allegations that the Circuit Court erred during the state post-conviction proceedings fail to provide a cognizable basis for federal habeas corpus relief, and any such challenge will be dismissed. Accordingly, Claims Two (a) and (b) will be DISMISSED.[6]

---

[6]    In his state habeas petition, Harvey raised Claim Two (a) solely as an error of state law, contending that adopting the Final Order violated Virginia Code § 8.01–654(B)(5) and Supreme Court of Virginia Rule 3A:24. (ECF No. 14–1, at 7.) In the § 2254 Petition, counsel, for the first time, seemingly attempts to put a constitutional gloss on these claims and argues that the Circuit Court denied Harvey a fair review for a variety of reasons. However, even with a constitutional aspect added, Harvey's claim remains only a claim that the state post-conviction court erred, a claim not cognizable in federal habeas. *See Bryant*, 848 F.2d at 493. Additionally, to the extent

Claim Two (c) suffers from similar deficiencies. In Claim Two (c), Harvey contends that "[t]he state habeas decision was an unreasonable determination of the facts and contrary to or an unreasonable application of Supreme Court law" (ECF No. 8, at 16) because he "was prejudiced by the cumulative errors of trial counsel." (*Id.* at 20.) At the heart of this claim, Harvey takes issue with the fact that the Circuit Court, in its dismissal of Harvey's state habeas petition, examined the "trial counsel's errors separately," when he believes that it should have evaluated the claims cumulatively and found that counsel was ineffective. (*Id.*) Once again, Harvey's allegations that the Circuit Court erred during the state post-conviction proceedings fail to provide a cognizable basis for federal habeas corpus relief, and for this reason alone any such challenge will be DISMISSED. *See Bryant*, 848 F.2d at 493. Moreover, as discussed below, to the extent that Harvey raises a new Sixth Amendment claim of ineffective assistance of counsel, this aspect of the claim would also be defaulted and barred from review here.

### B.   Claims Two (a) and (c) are Also Barred from Review

#### 1.   *Applicable Law*

Before a state prisoner can bring a § 2254 petition in federal district court, the prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). State exhaustion "'is rooted in considerations of federal-state comity' and Congress' determination in 28 U.S.C. § 2254(b) that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n. 10 (1973)). The purpose of exhaustion is "to give the State an initial opportunity to pass upon and correct alleged violations of its

---

Harvey somehow alleges a claim beyond an error of the Circuit Court on habeas review, that claim would be defaulted and barred from review. *See infra* Part II.B.

prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks omitted). Exhaustion has two aspects. First, a petitioner must utilize all available state remedies before he can apply for federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999). As to whether a petitioner has used all available state remedies, the statute notes that a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate opportunity to address the constitutional claims advanced on federal habeas. "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). Fair presentation demands that "both the operative facts and the controlling legal principles" must be presented to the state court. *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner. *Mallory v. Smith*, 27 F.3d 991, 994–95 (4th Cir. 1994). The United States Court of Appeals for the Fourth Circuit has summed up a petitioner's burden in this regard as follows:

> [T]he exhaustion requirement demands that the petitioner "do more than scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick."

*Id.* at 995 (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988)).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). A federal habeas petitioner also procedurally defaults claims when the "petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* (quoting *Coleman*, 501 U.S. at 735 n. 1).[7] The burden of pleading and proving that a claim is procedurally defaulted rests with the state. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (citing cases). Absent a showing of "cause for the default and actual prejudice as a result of the alleged violation of federal law," or a showing that "failure to consider the claims will result in a fundamental miscarriage of justice," this Court cannot review the merits of a defaulted claim. *Coleman*, 501 U.S. at 750; *see Harris v. Reed*, 489 U.S. 255, 262 (1989).

In Virginia, to exhaust state remedies, a "petitioner must present the same factual and legal claims raised in the instant petition to the Supreme Court of Virginia either by way of (i) a direct appeal, (ii) a state habeas corpus petition, or (iii) an appeal from a circuit court's denial of a state habeas petition." *Sparrow v. Dir., Dep't of Corr.*, 439 F. Supp. 2d 584, 587 (E.D. Va. 2006); *see also* Va. Code Ann. § 8.01-654(A)(1) (West 2020). "Whichever route the inmate chooses to follow, it is clear that [the inmate] ultimately must present his [federal habeas] claims to the

---

[7]     Under these circumstances, even though the claim has not been fairly presented to the Supreme Court of Virginia, the exhaustion requirement is "technically met." *Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)).

Supreme Court of Virginia and receive a ruling from that court before a federal district court can consider them." *Banks v. Johnson*, No. 3:07CV746–HEH, 2008 WL 2566954, at *2 (E.D. Va. June 26, 2008) (second alteration added) (quoting *Graham v. Ray*, No. 7:05CV00265, 2005 WL 1035496, at *2 (W.D. Va. May 3, 2005)) , *aff'd in part*, 173 F. App'x 203, 204 (4th Cir. 2006) (*per curiam*); *see also Sparrow*, 439 F. Supp. 2d at 587.

      2.    *Analysis*

In Claim Two (a), Harvey contends that "[t]he state habeas decision was an unreasonable determination of the facts and contrary to or an unreasonable application of Supreme Court law" because "[t]he state habeas court adopted wholesale the order written by counsel for the warden without alerting Harvey it was doing so." (ECF No. 8, at 16). Harvey raised this claim in the Supreme Court of Virginia solely as a violation of state law. *See supra* n.6. However, Harvey was required to expressly assert a federal constitutional claim in the state courts to preserve it for review here. *Duncan v. Henry*, 513 U.S. 364, 366 (1994). Simply put, the assertion of a similar state claim does not suffice. *Id.* Therefore, to the extent Harvey even raises a cognizable claim, Claim Two (a) is defaulted because no federal constitutional claim was fairly presented to the Supreme Court of Virginia for the purposes of exhaustion.

In Claim Two (c), Harvey contends that "[t]he state habeas decision was an unreasonable determination of the facts and contrary to or an unreasonable application of Supreme Court law" ECF No. 8 at 16) because "Harvey was prejudiced by the cumulative errors of trial counsel" (*id.*

at 20.) Harvey clearly did not raise a claim of cumulative trial error before the Supreme Court of Virginia.[8] Therefore, Claim Two (c) is also defaulted.[9]

For these reasons, Harvey fails to demonstrate any cause and prejudice for his default or a fundamental miscarriage of justice.[10] Accordingly, Claims Two (a) and (c), to the extent that they allege more than an error of the state post-conviction court, are defaulted, and barred from review here. Claims Two (a) and (c) will be DISMISSED.

### III.    ANALYSIS OF CLAIM ONE

### A.    The Applicable Constraints upon Federal Habeas Corpus Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 circumscribed this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and

---

[8]    Harvey also makes vague assertions woven through his § 2254 Petition and tied to no specific claim that counsel did not prepare for trial because he believed that the evidence against Harvey was weak because there was only one witness for the Commonwealth, and therefore, he was generally ineffective. Even if the Court were to consider this a claim, this claim was not raised before the Supreme Court of Virginia and it too, would be defaulted. Moreover, Harvey's allegations that counsel failed to prepare for trial are either belied by the record, or resulted in no prejudice to Harvey, as discussed in conjunction with each specific claim of ineffective assistance of counsel.

[9]    The Court agrees with Respondent that *Martinez v. Ryan*, 566 U.S. 1 (2012) does not apply here. The explicit language of *Martinez* indicates that its holding applies only to the initial-review collateral proceeding for raising claims of trial counsel error.  *See Atkins v. Holloway*, 792 F.3d 654, 661 (6th Cir. 2015) (citations omitted); *Johnson v. Warden of Broad River Corr. Inst.*, No. 12–7270, 2013 WL 856731, at *1 (4th Cir. Mar. 8, 2013) (citing *Martinez*, 566 U.S. at 16). Because the default of Claim Two (a) and (c) occurred on appeal from the initial-review collateral proceeding, and the lack of appellate counsel cannot serve as cause for the procedural default of Claims Two (a) and (c), these claims are barred from review here. *See Norris v. Brooks*, 794 F.3d 401, 405 (3d Cir. 2015) (citations omitted) (explaining that *Martinez* "applies only to attorney error causing procedural default during initial-review collateral proceedings, not collateral appeals"); *Atkins*, 792 F.3d at 661; *Johnson*, 2013 WL 856731, at *1.

[10]    Harvey makes no specific argument that he is actually innocent of murder as a means to avoid his procedural default. Nevertheless, the record establishes that any such argument would be unpersuasive as overwhelming evidence existed of his guilt even considering his new evidence.

convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Despite this standard, Harvey argues that his petition should be reviewed *de novo* because the state court made "its decision on a materially incomplete record." (ECF No. 8, at 8 (citing *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015).) Harvey contends that because the state court denied his requests for discovery and refused to hold an evidentiary hearing, the record "was artificially truncated" and "[f]or these reasons, as expanded upon within the presentation of each claim for relief, Harvey's petition should be reviewed *de novo* and this Court should hold an evidentiary hearing." (*Id.* at 9.) Harvey's petition also includes new factual allegations in support of some claims and seeks to proffer four witness affidavits. Besides asserting these new facts and broad arguments, Harvey fails to identify with any specificity in his § 2254 Petition how the record in state court was materially incomplete with respect to each specific claim and why that claim should not be considered to have been adjudicated on the merits.

Nevertheless, the Court will consider whether a "materially incomplete record" existed regarding Claims One (a), (b), and (c). From the Court's review of Harvey's § 2254 Petition, Claims One (a) and (b) appear to be premised on the same factual basis as raised in the state court with no new proffered evidence that could make the claim materially different. Therefore, Harvey's argument is not well taken with respect to these two claims, and his claims will be reviewed under the deferential standard of § 2254(d) because the Circuit Court adjudicated each on the merits. In Claim One (c), although Harvey adds vague new factual allegations in support of his claim, it is doubtful that the Circuit Court decided this claim on a "materially incomplete record." *Valentino v. Clarke*, 972 F.3d 560, 576 (4th Cir. 2020) (citation omitted). However, even if the Court were to consider these new allegations, they have no impact on the resolution of the claim as Harvey fails to demonstrate any deficiency of counsel or resulting prejudice. *See infra* Part III.C.3. With respect to Claim One (d), Harvey now proffers four witness affidavits that he did not present to the state court and presumably suggests that the Circuit Court did not "adjudicate[]" this claim "on the merits" because without these affidavits, the record was, once again, materially incomplete. *See Valentino*, 972 F.3d at 576. It is doubtful that the Court can consider this new evidence. Nevertheless, even if the Court were permitted to consider the new evidence, it does not alter the conclusion that Harvey fails to demonstrate any deficiency of counsel or resulting prejudice.

### B.     Summary of Relevant Evidence

To provide context for Harvey's claims of ineffective assistance of trial counsel, the Court first summarizes the evidence and arguments of the parties presented at trial.

1.    *The Commonwealth's Evidence of Harvey's Guilt*

The Commonwealth built its case on the testimony of Sherrelle, the victim's sister and only witness to the shooting, police testimony, and video footage from the club that was consistent with Sherrelle's testimony. Club Illusions, where the shooting took place, was located in the Richmond Inn and Suites. (Cir. Ct. Record 186–87.) Club Illusions was an open room with a bar at the back of the main floor, a very small dance floor two steps down from the main floor, with a stage and a soundboard in the corner, and two small VIP areas accessed by two steps. (*Id.* at 203–04; *see also id.* at 535–41.) Several off-duty Richmond City Police Officers were working security the night of January 17, 2016 and were outside of the club when the shooting occurred. (*Id.* at 235–36.) Club Illusions had one entrance where patrons would wait to enter the club. (*Id.* at 237.) Before entering the club, men were patted down for weapons by the bouncer and women were checked with a wand. (*Id.*) Throughout the evening, promoters and other DJs came to the club and not all of them were searched. (*Id.* at 239.)

Sherrelle, the sister of the victim, Jerquell, explained that, on January 17, she went to Club Illusions with friends, her sister, and her aunt. (*Id.* at 292.) Sherrelle had known Harvey, or "Head Bussa," for around six months at the time of the shooting. (*Id.* at 291–92.) Sherrelle arrived at the club around 10:30 p.m. (*Id.* at 292.) Around 12:00 a.m., Sherrelle observed Harvey "bouncing down the steps [to the dance floor] like he just came into the club" with DY and Cal.[11] (*Id.* at 293.) Harvey was wearing a black and white shirt. (*Id.* at 299.) After Sherrelle saw Harvey "come in the club and go to the dance floor, [she] didn't pay him any more attention." (*Id.* at 317.)

Jerquell entered the club around 12:38 a.m. (*Id.* at 602.) Sherrelle waited up front for her brother until he got into the club. (*Id.* at 296.) Sherrelle and Jerquell then headed to the dance floor

---

[11]    Cal's full name is Carroll Speights.

in front of the stage. (*Id.*) Sherrelle explained that her brother stayed on the dance floor the entire time, but that she walked off at some point and then came back down to the dance floor before the shooting. (*Id.* at 297.)

Sherrelle later observed Harvey come "bouncing" down the steps, now wearing a dark hoodie jacket. (*Id.* at 299.) Harvey then pulled a black and white bandana up over his face. (*Id.*) Sherrelle explained that she had never seen him wear a bandana on his face before. (*Id.* at 317.) As Harvey approached, DY tapped Jerquell's friend, BG, on the shoulder, and with his hands, "told him to step back." (*Id.* at 300–01, 314.) Sherrelle slid closer to her brother on his left side and warned him that Harvey was approaching, but Jerquell ignored her and turned toward the stage. (*Id.* at 313.) Jerquell did not have a firearm. (*Id.* at 313.) Harvey came within a foot and a half of her brother and "just shot him." (*Id.* at 314.) Sherrelle admitted she could not see the color of the firearm because it was dark in the club (*id.* at 302), and she explained that the dance floor was packed with people (*id.* at 310).[12] Sherrelle said that when she saw Harvey shooting she "took off running . . . between the sound booth and the stage" but that she "didn't stay there long, because when [she] looked back" she saw her brother was on the floor, [and she] ran back to [her] brother." (*Id.* at 303.) Sherrelle explained that she ran initially "because [she] didn't know if [Harvey] was gonna try to shoot me too." (*Id.* at 315.)

---

[12]     On cross-examination, counsel for Harvey attempted to discredit Sherrelle about her ability to see Harvey come down the stairs in a crowded club when she was only five foot four. (Cir. Ct. Record 310–11.) Sherrelle explained that she "turned around" and that "[i]t wasn't so packed that you couldn't see around you and you couldn't see space between you" or "what was going on around you." (*Id.* at 311–12.) Counsel's next question about how she happened to turn around at the exact time Harvey was coming down the stairs, elicited the following response from Sherrelle: "I turned around because it was told to us that he's supposed to be texting on the phone and said watch out, like he was going to do something harmful to my brother." (*Id.*)  Counsel objected, and the Circuit Court sustained the objection. (*Id.*) Nevertheless, counsel addressed the fact that Sherrelle had testified that "she was on the lookout for something to happen . . . [s]o much so that she is not even watching the show she came to see," in his closing to the jury. (*Id.* at 445.)

Sherrelle talked to a black female police officer (later identified as Officer Chasteen) inside the club and provided her name. (*Id.* at 305, 318.) Once they were moved out of the club, Sherrelle showed another officer a picture of Harvey from Facebook on her phone, and identified him as the killer, and the officer said he was familiar with Harvey and "[t]hat was it." (*Id.* at 305–06, 317–18.) In the morning, Sherrelle spoke with Detective Jamie Baynes at her brother's house and again identified Harvey as her brother's killer. (*Id.* at 306, 319.) Sherrelle spoke with police several times and (prior to learning that there was camera video footage from the club) provided her statement including what Harvey was wearing. (*Id.* at 307.)

Club Illusions and the Richmond Inn and Suites had twenty-five security cameras and footage was pulled from all of them. (*Id.* at 249.) Officer Richard McTernan, a Richmond City police officer, testified that he was familiar with Harvey and Carroll Speights from the precinct and noted that Harvey's nickname was "Buss Head, Head Bussa." (*Id.* at 271, 273–74, 276.) Officer McTernan viewed video footage from Club Illusions as well as still photographs taken from the footage and identified Harvey and Carroll Speights in the footage. (*Id.* at 274–76.) As the jury watched the video footage from various cameras in the club, Officer McTernan explained that Harvey and Speights walked into the club together, walked up the steps to the VIP section, and, at that point, Harvey tied a bandana around his neck. (*Id.* at 278–81.) Harvey and Speights then came onto the dance floor and Harvey repetitively moved a bandana on and off of his face. (*Id.* at 280–81, 283.) Harvey left the dance floor at 12:24 a.m. Approximately six minutes later, around 12:30 a.m., he returned to the dance floor and was talking with Speights while wearing a new hoodie jacket (thus covering the shirt he wore into the club). (*Id.* at 282–83; *see* Commonwealth's Exhibit 11.) At 12:44 a.m., Harvey and Speights entered the bathroom. (*Id.* at 284.) At 1:05 a.m., while wearing the bandana on his face and holding a firearm in his right hand, Harvey ran off the dance

18

floor, and then placed the firearm in the waistband of his pants and pulled the bandana off of his face as he ran to the entrance hall of the club. (*Id.* at 285–86; 586–593.) Harvey is the only person in the video clip running toward the exit with a firearm in hand. (*Id.* at 586–93; *see* Commonwealth's Exhibit 11.) Harvey and Speights then left the club around the same time. (*Id.* at 287.)

Four 9mm Winchester brand semi-automatic cartridge casings were found on the dance floor and a bullet was found in the wall. (*Id.* at 211–12, 228, 346.) Two 9mm Winchester bullets and another bullet fragment were found in three gunshot wounds in Jerquell's chest and shoulder. (*Id.* at 215, 357, 360–63.) The cartridges and bullets were consistent with having been fired from a Glock 9mm firearm. (*Id.* at 353.) Jerquell's wounds reflected that the bullets were fired at close range. (*Id.* at 371.)

Detective Sandy Leadbetter, a detective with the Richmond City Police Department and a member of the United States Marshals Fugitive Task Force, testified that she was tasked with locating Harvey during the early hours of January 18. (*Id.* at 320.) Her unit checked Harvey's last known address, friends' houses, numerous hotel rooms, and any address they could think of where Harvey might be, but were unable to locate him. (*Id.* at 321.) Detective Leadbetter learned that Harvey had turned off his current phone service and had changed his phone number on January 18. Thus, Harvey's phone could no longer be tracked by its location. (*Id.* at 336–37.) Around 6:30 a.m. on January 19, approximately 30 hours after the murder, Detective Leadbetter determined that Harvey was at an apartment on Laburnum Avenue that was rented to Ruby Speights and called in the SWAT team. (*Id.* at 323, 325.) Harvey was the only person in the apartment and was arrested. (*Id.* at 323, 325.) Officers found a phone that was previously associated with Harvey's old phone number and a black and white bandana in the apartment. (*Id.* at 324–26, 337.)

2. *Harvey's Defense Testimony*

Harvey testified in his own defense and had a different explanation for what occurred and what was caught on video. Harvey explained that he knew Jerquell because Jerquell dated one of Harvey's ex-girlfriends, Chansiqua. (*Id.* at 376.) Chansiqua told Jerquell that Harvey did not like him dating her, which Harvey insisted was not true. (*Id.* at 377.) After the two men met up and spoke about the rumors, Harvey explained that everything was okay between them, although Harvey admitted that before that, "there was some tension between [the] two." (*Id.* at 377–78.) Harvey testified that both he and Jerquell were from Southside, but "Southside is broke down into two halves," and Jerquell was from "up top" and Harvey was from "the bottom." (*Id.* at 379.) Jerquell and his friends from the northern part had a problem with "[a] local rap group from [Harvey's] end of Southside called the Willow Boys." (*Id.* at 379.) Harvey explained that his friend Cal Speights was in the Willow Boys and he agreed that the Willow Boys also "[h]ad a problem with people from uptown." (*Id.* at 380.)

Harvey testified that he got to the club around 12:00 a.m. and he "just happened to walk in the club at the same time" as his friend, Cal Speights. (*Id.* at 380–81.) Most of the Willow Boys were already in the club. (*Id.* at 382.) Harvey saw Jerquell's sister, aunt, and Chansiqua inside the club when he first entered. (*Id.* at 383.) Harvey did not put the bandana on until after he got into the club because he "might get hassled coming in the door with something like that" because the police "think everything [is] gang affiliation." (*Id.* at 401–02.) Harvey explained that he wore the bandana as part of his outfit when he was dancing and rapping, and that Sherrelle would have seen him wearing it because he had it over his face periodically throughout the night. (*Id.* at 385–86.) Harvey admitted that he was the only person in the club wearing a bandana over his face while dancing and that he "happened to have the bandana up around [his] face, just like Sherrelle

20

Cheatham said, when the murder happened." (*Id.* at 402–03.) Harvey testified that he put the hoodie on inside the club because it was cold. (*Id.* at 408.)

Around 12:40 a.m., video captured Cal and Harvey talking on the dance floor near the sound booth, and Harvey explained that a man named "Little D," walked up to Cal and informed him that Jerquell and his friends had arrived at the club and that they had firearms. (*Id.* at 386–88, 405.) Cal had a firearm. Harvey did not have a firearm but took an extra one from Little D. (*Id.* at 387–88, 405–06.) After receiving the firearm in front of the bathroom, at 12:44 p.m., Harvey and Cal walked into the bathroom, but only stayed about twenty seconds because security was in the bathroom so they could not smoke weed in there. (*Id.* at 404–05.) Harvey placed the gun in his "waist in the back." (*Id.* at 406.) Harvey talked to a woman and then, at most, ten minutes before the shooting, the headlining DJ began, and everyone crowded the floor. (*Id.* at 389.) Harvey left his friends so he could see the stage and was dancing on the other side of the dance floor by the VIP section with the bandana pulled up over his face. (*Id.* at 390–91, 403.) Harvey said as he turned around, he saw a flash, but he thought the sound of the shots were in the music. (*Id.* at 391.) Harvey ran up the stairs with the firearm in his hand and exited the club with the crowd with Cal running behind him. (*Id.* at 392–94.) He explained that he pulled out the firearm because he "didn't know what was going on. It was just a reflex" because he was "already kind of paranoid, because the company I was around and these situations." (*Id.* at 392) Harvey waited out front until his family members came out of the club but did not talk to Cal. (*Id.* at 394.)

Harvey then went to an after-hours club where the Club Illusions' shooting was "the talk of the town," and stayed there until 3:00 a.m. (*Id.* at 395–96.) Afterwards, Harvey went to his aunt's house to sleep. (*Id.* at 396.) Harvey explained that even though he had clothes at his aunt's

house, he did not change because he had "just put them clothes on to go to the club. They was a brand new outfit." (*Id.* at 396.) Harvey gave the firearm back to Little D the next day. (*Id.* at 409.)

Harvey explained that he ended up at the apartment of Ruby Speights, Cal's sister, the following day because he was with Cal's brother Damon at the recording studio for six or seven hours and then afterwards dropped him off there. (*Id.* at 394–95, 397.) Harvey had not seen or talked to Cal at all that day. (*Id.* at 397.) Harvey explained that he changed his phone number at the Metro PCS on Jefferson Davis because he was getting a lot of restricted number calls that he thought might be from Chansiqua. (*Id.* at 397–98, 415–16.) Harvey testified that before he met Damon, Damon told Harvey that people were saying that Harvey had killed Jerquell and the police were looking for him. (*Id.* at 398–99.)[13] Harvey got to Ruby's apartment around 12:00 a.m. and then fell asleep on the couch. (*Id.* at 399.) He was awoken by the police banging on the door. (*Id.* at 399.) Harvey explained that he had talked to his mom earlier to give her his new phone number and she informed him that police had come to the house looking for him. (*Id.* at 399.)

On cross-examination, Harvey admitted that initially he did not tell Detective Baynes about important details from the night. Harvey first told Detective Baynes that he was not wearing a bandana, but he explained during trial that he did so because he did not want to be labeled a gang member. (*Id.* at 403–04.) Harvey also initially told Detective Baynes, "I would love to see somebody say I had a gun that night." (*Id.* at 409.) Only after observing the video and seeing himself captured on it with a firearm and wearing the bandana did Harvey admit to having the gun and wearing the bandana to his attorney. (*Id.* at 418–19.) Harvey then claimed that once he learned

---

[13]    The police reports that Harvey attached to his state habeas petition indicated that "[w]ord quickly spread through the patrons that the victim was shot by 'HEAD BUSSA,'" (Hab. Record 59), and that patrons indicated to police that Head Bussa had "been passing messages through other people to Jerquell that he was going to kill him or hire someone to kill him" (*id.* at 69).

that other people had firearms, he borrowed the firearm because he felt better knowing he had one. (*Id.* at 418.) When asked why he did not just leave if he thought people who were in the club were dangerous, Harvey stated that he "didn't want to seem like [he] was running," and he thought "[i]f anything, them two would have gotten into a fight or something." (*Id.* at 417.)[14] Harvey also told Detective Baynes that he "wasn't near" when the shots were fired but admitted during trial that he was on the dance floor and pulled his gun out. (*Id.* at 410, 412.) The photos and video of the club confirm that the dance floor itself was very small. Harvey also first told police that he came to the club by himself, but later explained that he meant that Cal had not ridden with him to the club— only walked in with him. (*Id.* at 410–11.) Harvey also failed to tell Detective Baynes that he was still wearing the same clothes from the club at the time of his interview even though he was asked about his clothing. (*Id.* at 413.) When asked about wearing the same clothes for thirty hours after being in a smoky club, Harvey claimed that thirty hours, was "just was a day" to him. (*Id.* at 413–15.) Harvey did not tell Detective Baynes that he had changed his phone number or why. (*Id.* at 416.) Finally, Harvey admitted that he had been convicted previously of three felonies. (*Id.* at 419.)

Detective Jamie Baynes was the lead investigator on the Jerquell Cheatham homicide case. (*Id.* at 420.) Detective Baynes testified that Harvey waived his Miranda rights and agreed to speak with Detective Baynes, but Baynes noted that some of Harvey's answers were dishonest. (*Id.* at 422.)

In the end, the jury voted unanimously to convict Harvey with the first-degree murder of Jerquell Cheatham, and the use of a firearm in the commission of murder. (*Id.* at 46.)

---

[14]     Harvey never explains who "them two" would have been.

C.      **Analysis of Ineffective Assistance Claims**

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.[15]

---

[15]     Apart from the claims he presents, Harvey's § 2254 Petition also alleges that current habeas counsel experienced significant difficulty in obtaining trial counsel's files and videos from the club because trial counsel left the practice of law. (ECF No. 8, at 5.) Current habeas counsel was able to obtain copies of the videos and certain records the Court would presume came from trial counsel (or another attorney that served as trial counsel in a limited role) such as investigation materials, police reports and still shots of video footage. However, he argues he was unable to obtain trial counsel's file and that had he been able to obtain trial counsel's file it would "show that trial counsel did not start preparing for trial until days before trial and did not contact witnesses." (ECF No. 8, at 5–6.) While all counsel have an ethical obligation to retain files and provide them upon request to their former clients, *see* Va. Rules of Pro. Conduct R. 1.16, the issue here is muddled by the fact that trial counsel was no longer in practice. More importantly, Harvey did receive portions of the file and Harvey cannot demonstrate ineffective assistance of counsel based on vague and conclusory allegations or speculation of what the remaining file might have shown. *See United States v. Roane*, 378 F.3d 382, 400 (4th Cir. 2004) (explaining that "[a]iry generalities" and "conclusory assertions . . . [do] not suffice to stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing" (alterations in original) (some quotation marks omitted) (citation omitted)). Even if these allegations about Harvey's trial counsel's lack of preparedness were true, the record does not establish any prejudice to Harvey as discussed below in conjunction with each claim. Additionally, Harvey's allegations risk conflating trial counsel's actions after trial with trial counsel's actions prior to and during trial. This is improper, as trial counsel's

1.     *Inconsistent Statements (Claim One (a))*

In Claim One (a), Harvey contends that trial counsel was ineffective for failing to impeach the sole prosecution witness, Sherrelle Cheatham, with two prior inconsistent statements. (ECF No. 8, at 9.) First, Harvey contends that although Sherrelle "testified at trial that she talked to a male and female officer while still at the nightclub and claimed that she identified Harvey to the male officer as the shooter, by showing him a picture of Harvey from Facebook" (*id.*), emails from off duty officers working at the nightclub on the night of the shooting failed to indicate that anyone had identified the shooter (*id.* at 10). Harvey contends that "[o]bviously trial counsel should have confronted both [Sherrelle] with these statements and called those police officers to trial to testify" or "trial counsel should have recalled [Sherrelle] and questioned her about this." (*Id.*)

Second, Harvey argues that Sherrelle testified at trial that Harvey was wearing a black and white bandana in the club on the night of the shooting, but failed "to note that Harvey was wearing a bandana" when interviewed in the club, or later by Detective Baynes. Harvey argues the inconsistency demonstrates that Sherrelle "did not know that because she did not see Harvey that night." (*Id.* at 10.)

In discussing and rejecting this claim in his state habeas petition, the Circuit Court explained the following:

> In Claims 1 through 3 petitioner alleges that trial counsel was ineffective because he failed to impeach Sherrelle Cheatham's identification testimony by using evidence turned over by the Commonwealth, containing alleged statements by [Sherrelle] that purportedly contradicted her trial testimony that she identified petitioner while at the club by showing a photograph of him to an unidentified officer, which is not supported by the evidence turned over by the Commonwealth in discovery. Defense Counsel discovered that Officer Chasteen was the subject of email during his brief cross-examination of her. Defense counsel concluded that Officer Chasteen's description in the email with regards to Sherrelle'[s] previous

_____

effectiveness is determined at the time of his representation, not years later. *Cf. Strickland*, 466 U.S at 689 (requiring that the Court must make "every effort . . . to eliminate the distorting effects of hindsight").

testimony was "marginally different, at best." Petitioner fails to demonstrate that counsel was ineffective for failing to put on "marginally different, at best" evidence. *See Fitzgerald v. Bass*, 6 Va. App. 38, 54–55, 366 S.E.2d 615, 624–25 (1998); *accord Fitzgerald v. Thompson*, 943 F.3d 463, 467 (4th Cir. 1991). There is no reason to believe that additional evidence would have altered the assessment of the credibility of [Sherrelle's] testimony. *See Moody v. Polk*, 408 F.3d 141, 154 (4th Cir. 2005) ("[P]rejudice does not exist simply because more corroborating evidence could have been presented.").

Further, the record shows that [Sherrelle] was the sister of the victim and her identification of petitioner as the shooter was subjected to attack by the defense during cross-examination at trial. On appeal, the Court of Appeals found that [Sherrelle's] identification of petitioner coupled with the surveillance video capturing petitioner running from the scene of the shooting, removing a bandana from his face and putting a firearm in the waistband of his pants was sufficient to support the conviction. Significantly, [Sherrelle's] examination shows that she did not know the video existed when she identified petitioner as the shooter and gave her statement to police on the night of the shooting. A reasonable trial attorney could have concluded, as counsel did here, that the additional evidence was of marginal value and have chosen not to present it. More importantly, petitioner cannot demonstrate a reasonable likelihood of a different outcome at trial with cumulative impeachment evidence.

Claim 1 through 3 fail to demonstrate deficient performance or prejudice under the demanding *Strickland* test and are dismissed.

(Hab. Record 267–69 (paragraph numbers and emphasis omitted).) As discussed below, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts in the Circuit Court's rejection of this claim. *See* 28 U.S.C. § 2254(d)(1)–(2).

With respect to the alleged inconsistency about Sherrelle's statements to officers the night of the shooting, Sherrelle testified that she provided the female officer with her name but did not really speak with her or anyone at great length. (*Id.* at 305, 318.) The police statement from Officer Chasteen, the female officer, indicated that Sherrelle "saw who shot [her brother] but did not say who. She was distraught and bit uncooperative." (Cir. Ct. Record 99.) Harvey fails to demonstrate, and the Court fails to discern, how Sherrelle's statement is inconsistent with Officer Chasteen's statement, much less inconsistent enough to warrant recalling Sherrelle to the stand to attempt to impeach her on this basis. Counsel further explained that he determined that calling Office

Chasteen in the defense case to probe her observations about Sherrelle would have been more harmful than helpful, because she would have highlighted how distraught Sherrelle was after the shooting to the jury. (Hab. Record 137.) Counsel's tactical decision was within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Second, Sherrelle explained that she identified Harvey to a different officer later, outside of the club. (Cir. Ct. Record 305–06, 318.) Sherrelle testified that she showed an officer a picture of Harvey from Facebook on her phone, and identified him as the killer, and the officer said he was familiar with Harvey and "[t]hat was it." (*Id.* at 305–06, 317–18.) However, in statements from two male officers who were at the scene there is no indication that any witness identified the shooter. Harvey contends that Sherrelle's statement is inconsistent with the officers' statements. Simply because these two officers did not state that a witness identified Harvey as the shooter does not necessarily preclude that it happened. Moreover, had trial counsel questioned Sherrelle about her testimony, there is no indication that she would have altered it based on the content of the statements from the officers. Rather, Sherrelle would have likely once again testified that she knew Harvey and identified him. Again, counsel's tactical decision was reasonable.

Nevertheless, even if Sherrelle's statements were inconsistent, Harvey fails to establish any prejudice because Sherrelle clearly identified Harvey as the shooter to police. (*See* Cir. Ct. Record 306, 319.) Moreover, the video evidence is consistent with Sherrelle's testimony, and the jury found Harvey's version of the events incredible. Therefore, Harvey also fails to demonstrate any prejudice from Sherrelle's purportedly inconsistent statements. In sum, Harvey fails to demonstrate any deficiency of counsel or resulting prejudice for failing to question Sherrelle about these minor inconsistencies in her testimony.

With respect to the alleged inconsistency about the bandana, both Sherrelle and Harvey testified that they saw each other in the club prior to the shooting. When interviewed, Sherrelle described to police the exact clothes Harvey was wearing, except the bandana.

As the Circuit Court noted, given this factual backdrop, counsel would have had little reason to question Sherrelle about why she did not mention that Harvey was wearing a bandana to Officer Chasteen or to Detective Baynes. Sherrelle did not provide any information about the shooter to Officer Chasteen. Simply because she did not mention that Harvey was wearing a bandana to Detective Baynes does not otherwise make her testimony incredible. Counsel explains that "as far [as] defense counsel knew [Sherrelle] never did mention a bandanna [sic] prior to trial, but there is no evidence that she was ever asked either. In essence, defense counsel would be asking a leading question, on what appeared to be a minor issue, in which defense counsel did not know what the witness's response would be." (Hab. Record 137.) Counsel reasonably determined that questioning Sherrelle about the bandana could result in a number of unknown answers, some of which could actually result in making her testimony more credible to the jury. For example, Sherrelle could have bolstered her testimony by stating that she did tell the police about the bandana, explain the discrepancy by testifying that she was not asked about the bandana, or explain that she simply forgot to mention the bandana due to being upset by her brother's murder. Sherrelle's testimony was otherwise entirely consistent with the video evidence and overwhelmingly established that Harvey, the only person confirmed to have a firearm at the club, shot and killed her brother. In sum, Harvey fails to demonstrate that counsel was deficient or any resulting prejudice from counsel's failure to attempt to impeach Sherrelle on this basis. Therefore, Claim Two (a) lacks merit and will be DISMISSED.[16]

---

[16]     Harvey also argues that Sherrelle made "numerous" mistakes in her statement to Detective Baynes but provides only two examples. Neither of the mistakes make her testimony any less

2.    *Malicious Wounding Charge (Claim One (b))*

In Claim One (b), Harvey contends that trial counsel was ineffective for "fail[ing] to impeach [Sherrelle] with her pending malicious wounding charge," which was pending in Chesterfield County. (ECF No. 8, at 11.) Harvey argues that

> [t]rial counsel knew or should have known that [Sherrelle] had a current charge for malicious wounding and at the time of the crime had been hiding from law enforcement because of her outstanding warrant in Chesterfield. By the time of trial [Sherrelle] was out on bond. Trial counsel failed to cross-examine [Sherrelle] for bias – the obvious: that [Sherrelle] wanted to please the prosecution in the hope of more lenient treatment in her own case. Inexplicably, trial counsel failed to raise [Sherrelle's] pending felony charge in cross-examination or alternatively to re-call her or ask for a continuance.

(*Id.*)[17] In discussing and rejecting this claim in his state habeas petition, the Circuit Court explained as follows:

> Regarding Claims 4(a) and 4(b), counsel was aware that there was an unrelated charge pending against [Sherrelle] at the time of petitioner's trial. Counsel did not cross-examine [Sherrelle] about the charge because the prosecution disclosed to counsel that the prosecution had learned about the charge only the night

---

credible. (ECF No. 8, at 13.) First, the Court notes that Sherrelle was not questioned about her statements to Detective Baynes, and no testimony at trial demonstrated her statements were inconsistent. Moreover, trial counsel wisely eschewed questioning Detective Baynes about inconsistencies in Sherrelle's statement because it would have highlighted how consistent her statement to police was with her trial testimony and how unequivocal Sherrelle was in her identification of Harvey as the murderer. Harvey did not submit Sherrelle's statement to Detective Baynes with his § 2254 Petition, but the Court found the relevant portion in the Circuit Court record. (Cir. Ct. Record 97.) Harvey contends that Sherrelle told Detective Baynes that Harvey arrived at the club at 12:30 a.m., but at trial she testified that it was 12:00 a.m., consistent with the video. This is not a significant inconsistency. The time that Harvey arrived at the club has little bearing on the murder, as he was clearly at the club at the time of the murder. Next, Harvey takes issue with Sherrelle's testimony that Harvey arrived at the club with DY and Cal. However, Sherrelle only testified that she saw Harvey with Cal and DY inside of the club coming on to the dance floor, she did not say that she saw Harvey arrive at the club with DY. (*Id.* at 299.)

[17]    Harvey suggests that "[t]he only reason that [Sherrelle] was not cross-examined for bias was because trial counsel failed to prepare and completely mishandled the cross-examination by failing to put forth the obvious allowable theory of bias and motive to fabricate." (ECF No. 8, at 12.) Harvey's statement is based solely on unsupported speculation and conjecture and is not entitled to presumption of truth. Moreover, this statement is belied by the record.

before petitioner's trial, and represented to counsel that no one had discussed the charge with her. Counsel made a tactical decision not to raise this evidence at petitioner's trial. Given these circumstances, that decision was reasonable. Petitioner's claims fail to demonstrate deficient performance. Further, no prejudice resulted from counsel's failure to introduce evidence that there was an unrelated charge pending against [Sherrelle]. Her testimony at trial that petitioner shot her brother was corroborated by the security video and still photos taken from the video. The credibility of her testimony was further enhanced by the fact that she was unaware of the security video until close to the time of trial. The fact that [Sherrelle] has been charged with an unrelated crime would have had little, if any, impact on the credibility of her testimony. Counsel was not ineffective for not presenting this evidence, and petitioner has failed to demonstrate a reasonable likelihood of a different outcome has this evidence been presented to the jury. *Fitzgerald*, 6 Va, App. at 54–55, 366 S.E.2d at 624–25.

Claims 4(a) and 4(b) fail to demonstrate either prong of *Strickland* and are dismissed.

(Hab. Record 269–70 (paragraph numbers and emphasis omitted).) The Court discerns no unreasonable application of the law and no unreasonable determination of the facts in the Circuit Court's rejection of this claim. *See* 28 U.S.C. § 2254(d)(1)–(2).

Counsel made a strategic decision not to attempt to impeach Sherrelle with her pending malicious wounding charge. Counsel averred that he decided not to question Sherrelle about this charge, because the Commonwealth informed him that "no one had ever discussed the charge with [Sherrelle] and they did not find out [about the charge] themselves until the night before." (Hab. Record 137.) Therefore, counsel reasonably perceived that questioning Sherrelle about this motive to lie would not be effective, as Sherrelle would testify that she had not discussed her charge with the Commonwealth and counsel had no evidence to suggest otherwise. Moreover, Harvey's theory that Sherrelle had a motive to lie because she had a pending criminal charge would have been inconsistent with his trial defense theory. Harvey theorized that Sherrelle did not observe her brother's murder, but instead, she simply heard rumors the night of the murder that Harvey had killed her brother and adopted the rumors as fact. If trial counsel had attempted to impeach Sherrelle based on a different motive to lie, it could have undercut his stronger theory that Sherrelle

did not see the murder. Thus, counsel was not deficient for failing to question Sherrelle about a

pending criminal charge. Further, as the circuit court correctly noted, Sherrelle's testimony was

corroborated by video and photographic evidence, and therefore no prejudice resulted.

Accordingly, Sherrelle fails to establish any deficiency of counsel or resulting prejudice.

Consequently, Claim One (b) lacks merit and will be DISMISSED.

### 3.   *Failure to Contradict Cheatham with Videos (Claim One (c))*

In Claim One (c), Harvey argues that counsel rendered ineffective assistance when he

failed to contradict Sherrelle's testimony with video footage of the shooting. Harvey contends that

"[v]ideo footage from camera 8 shows the area of the shooting at the exact time of the shooting

1:05:01 a.m., and the club is too crowded to determine whether Sherrelle Cheatham is in the

camera frame or near the shooting." (ECF No. 8, at 13.) However, argues Harvey, thirty seconds

after the shooting Sherrelle "can be seen approaching the area of the shooting from another area

of the club. The wide-angle from camera 9 shows Sherrelle coming from the small set of stairs and

not from between the sound booth and stage, as she testified." (*Id.*) In rejecting this claim,[18] the

Circuit Court explained as follows:

> In Claim[] . . . 8, petitioner alleges that counsel should have used the video to
> discredit Cheatham's testimony [and] . . . to argue that she was not even [on the
> dance floor[19]] at the time of shooting. Counsel states the video/still photos from
> that video footage is blurry at times and otherwise fails to support the facts as
> petitioner has alleged. "As *Strickland* made clear, [this Court's] role on habeas
> review is not to nitpick gratuitously counsel's performance. After all, the
> constitutional right at issue here is ultimately the right to a fair trial, not to perfect

---

[18]   In Claim 7 of his state habeas petition, Harvey argued that the video would discredit
Sherrelle's testimony about the two men she testified Harvey arrived at the club with. (Hab. Rec.
at 22.) Harvey does not raise that claim in his § 2254 Petition.

[19]   The Circuit Court opinion states that Harvey argued Sherrelle "was not even in the club"
rather than "on the dance floor." (Hab. Record 271.) Harvey and Respondent agree, however, that
the Circuit Court opinion misstated his argument, which was that the video would show Sherrelle
was not on the dance floor at the time. (*See* ECF No. 8, at 13; ECF No. 14, at 41 n.11.)

representation." *Hodges v. Colson*, 711 F.3d 589, 617 (6th Cir. 2013) (citations omitted).

> Numerous choices affecting conduct of the trial, including the objections to make, the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment and the larger strategic plan for the trial.

*Gonzalez v. United States*, 553 U.S. 242, 249 (2008). Accordingly, counsel was not ineffective for failing to utilize the video footage to cross-examine [Sherrelle] as petitioner now contends. Indeed, the footage and still photos corroborated her testimony and she was unaware of the video at the time she gave her testimony to police. (Tr. 182.) Petitioner's allegations also fail to demonstrate *Strickland* prejudice.

> Claims 7 and 8 are dismissed.

(Hab. Record 271–72 (paragraph numbers and emphasis omitted).) Once again, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts in the Circuit Court's rejection of this claim. *See* 28 U.S.C. § 2254(d)(1)–(2).

Because the Commonwealth only had one eyewitness testify, counsel's theory at trial was that Sherrelle did not actually observe the shooting but was determined to pin the killing on Harvey. In his closing argument, counsel played video from right after the shooting and showed the jury that "[y]ou can actually see [Sherrelle], as she told you, coming back to find her brother, roughly some 26 seconds after." (Cir. Ct. Record 444.) The jury could see from the video where Sherrelle ran onto the dance floor. Counsel attempted to cast doubt on whether she could have made it back across the floor in that amount of time. (*Id.*) Counsel also attempted to convince the jury that although she did not see who shot her brother, she "[p]ossibly heard from a number of people who thought that [Harvey] did do it, and that was god [sic] enough for her to believe that was what happened." (*Id.* at 445.)

Harvey faults counsel for not playing the specific video clip from camera 9 at trial, arguing that the video clip would contradict Sherrell's testimony that she was on the dance floor at the time of the shooting as well as her testimony that she was coming from the sound board. However, as

described above, trial counsel showed another video of Sherrell returning to the dance floor approximately 30 seconds after the shooting, and argued that Sherrell could not have seen the shooting. In explanation for why he did not show the video from camera 9, Counsel averred that the specific "video footage was black and white and not very clear. Furthermore, the area the Petitioner is referring to where the shooting happened is particularly blurry." (Hab. Record 138.)

Although Harvey described what he believes camera 9 to show, the Court was unable to confirm certain aspects of Harvey's argument, specifically the area from which Sherrell comes after the shooting (either from the sound board as she testified or from the stairs as Harvey argues). Camera 9 does show people moving in different directions for several minutes after the shooting and is blurry in many areas. It is also clear that camera 9 does not establish whether Sherrelle was or was not on the dance floor when the shooting occurred. Club Illusions was one big open room with one or two steps leading to the VIP area. (Cir. Ct. Record 203–04.) Sherrelle clearly could have run up two steps when she heard the shots and then returned to floor when she noticed it was her brother who had been shot. Indeed, this would be consistent with her testimony that she ran off the dance floor and then returned when she noticed her brother had been shot. Even if camera 9 did show that Sherrelle came from a different direction than she stated in her testimony, this fact does not make Sherrelle's testimony materially less credible. Given the argument made by counsel, and his description of his reason for not using video from camera 9, counsel was not deficient for failing to play this clip for the jury.

Harvey also fails to demonstrate any prejudice from counsel's alleged error. To determine whether counsel's performance prejudiced a defendant, the Court must consider the purported error in light of "the totality of the evidence before the . . . jury." *Valentino v. Clark*, 972 F.3d 560, 583 (4th Cir. 2020) (quoting *Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011)). Sherrelle's

testimony about the material events of the night was consistent and persuasive. Sherrelle unequivocally testified that she knew Harvey and she saw Harvey shoot her brother. The video footage confirmed her version of the events surrounding the shooting. Harvey's testimony, on the other hand, was inconsistent with the video evidence. What was abundantly clear to the jury was that the video footage captured Harvey fleeing the area of the shooting, pulling down a black bandana, and stuffing a firearm into the waist band of his pants. Although Harvey insisted that other people in the club had firearms, he is the only person on the video with a firearm in hand immediately following the shooting. In addition, Harvey first lied to police about having a firearm in the club, but then when confronted with the video evidence, admitted that he had a firearm. Sherrelle's statement to police, provided before she even knew video footage existed, was consistent with what the videos reflected. In light of the Commonwealth's compelling and overwhelming evidence that Harvey was the shooter, he fails to demonstrate any resulting prejudice from counsel's failure to show the video clip at trial.

For the first time in his § 2254 Petition, Harvey argues that counsel and Harvey viewed the video footage prior to trial, "counsel never complained to Harvey that the footage was too blurry and agreed with Harvey that he would play the footage at trial," and "[w]hen trial counsel failed to play the footage [at trial], he explained to Harvey that the court did not provide him with the video equipment he needed." (ECF No. 8, at 13.) To the extent this new aspect of Claim One (c) is properly before the Court,[20] and even assuming a deficiency of counsel, Harvey fails to demonstrate any prejudice from counsel's failure to play a certain video clip. Accordingly, Claim One (c) will be DISMISSED.

---

[20]     Harvey did not raise this aspect of his claim before the Supreme Court of Virginia and it is therefore, defaulted and barred from review here. Even considering these allegations, they also fail to show that counsel was deficient or that Harvey was prejudiced.

4.    *Failure to Contradict Sherrelle's Testimony With Witnesses (Claim One (d))*

a.    **The Circuit Court's Conclusion was not Unreasonable**

In Claim One (d), Harvey argues that counsel rendered ineffective assistance when he failed to contradict Sherrelle's testimony with witnesses. (ECF No. 8, at 14.) Harvey contends that "[n]umerous witnesses who were in the club and near the shooting were willing to testify for Harvey, but trial counsel never contacted them." (*Id.*) Harvey suggests that trial counsel did not prepare for trial because the prosecution told him the case was weak and would be dismissed. (*Id.*) Harvey contends that five days before trial, Harvey gave trial counsel and his investigator "a list of witnesses that included: Brittney Horne, Shanika Horne, Rashawn Williams, Rodney Boiling, Demichael 'DY' Billie and Carroll 'Cal' Speights." (*Id.*) Harvey alleges that counsel and his investigator did not contact any of his witnesses before trial. (*Id.* at 14.) The Circuit Court rejected this claim because

> petitioner has failed to proffer the affidavit of any named witness as to how the witness would have testified if called as a witness as trial. Petitioner's failure to do so is fatal to his claims. See *Muhammad* [v. Warden], 274 Va. [3,] at 19, 646 S.E.2d at [182,] 195 [(2007)]; *Bassette* [v. Thompson], 915 F.2d [932,] at 940–41 [(4th Cir. 1990)]. Furthermore, counsel's investigation and efforts to contact witnesses named by petitioner "led to dead ends or people with no useful information." Petitioner insisted that witnesses would appear on the date of trial. One such witness did appear on the date of trial. Counsel spoke to her and she advised counsel that if called as a witness she could not testify as petitioner wanted her to; she "kn[e]w what [petitioner] want[ed] her to say but [she] c[ould]n't say that." This was the woman's response, even when pressed by counsel. For these reasons counsel had no good faith basis for requesting a continuance in order to secure the appearance of witnesses. Petitioner's claims fail to demonstrate counsel's performance was deficient or *Strickland* prejudice. Petitioner's allegations 10 and 11 are dismissed.

(Hab. Record 272–73 (first through seventh alteration added).) As discussed below, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts in the Circuit Court's rejection of this claim. *See* 28 U.S.C. § 2254(d)(1)–(2).

For the purposes of this § 2254 Petition, the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). In his § 2254 Petition, Harvey faults trial counsel for "never contact[ing]" the "[n]umerous witnesses who were in the club and near the shooting [and] were willing to testify for Harvey." (ECF No. 8, at 14.)[21] However, Harvey failed to proffer any of these witnesses' statements to the Circuit Court with his state habeas petition, although these individuals were either friends with or family of Harvey, and Harvey clearly had their contact information because he provided it to trial counsel. (*Id.* at 14.) Harvey fails to explain why he did not obtain these alleged witnesses' statements at that time. For this reason alone, the Circuit Court's determination that Harvey failed to show any deficiency of counsel or prejudice from counsel's actions was not unreasonable. *United States v. Terry*, 366 F.3d 312, 316 (4th Cir. 2004) (requiring "concrete evidence" of exculpatory testimony); *Bassette*, 915 F.2d at 940–41 (requiring proffer of mitigating evidence to state a claim of ineffective assistance).

Moreover, the record reflects that counsel attempted to contact some of the witnesses Harvey identified and these witnesses did not provide counsel with any testimony beneficial for Harvey's defense. Counsel averred that[22]

> Throughout the course of trial preparation, Petitioner provided defense counsel with different name[s] and numbers of people that he would like contacted. The efforts to contact these people led to dead ends or the people had no useful information. Prior to the day of trial, Petitioner insisted that the witnesses proving his innocence would be at trial. When Petitioner was pressed further, defense counsel was given the same assurances. One such witness did appear the morning of Court. When defense counsel spoke with said witness[] in private, she stated: "I

---

[21]   Harvey now suggests that these witnesses are reliable based solely on the fact that over half of them have the same phone number in 2021 as they did in 2016. (ECF No. 8, at 14 n.6.) The Court is not sure how this is at all relevant to the question of whether counsel was ineffective or whether their statements would be credible.

[22]   The Court corrects the capitalization and punctuation in counsel's affidavit.

> know what he wants me to say but I can't say that." When pressed further about the importance of her testimony, the witness[] stated: "I can't get up there and say that." Referring to the witness stand. The conversation never went any further and defense counsel never even got her name.

(Hab. Record 138.) Although Harvey insists that he had "[n]umerous witnesses" that were available and willing to testify, the record demonstrates otherwise. Counsel cannot be faulted if the individuals he contacted could not provide testimony helpful to Harvey's case or did not respond to his call. Moreover, counsel wisely chose not to call as a witness the only person who showed up the day of trial. This woman was available, but she was unable or unwilling to provide the testimony Harvey sought. Counsel cannot be faulted for not putting her on the stand, as he had no basis to believe the testimony would be favorable to Harvey and faced the potential risk that the witness would have completely undermined Harvey's credibility. Harvey fails to show any deficiency of counsel or resulting prejudice and the Court discerns no error in the Circuit Court's dismissal of this claim.[23]

For the first time with his § 2254 Petition, Harvey provides four witness statements that he failed to present to the state courts. The Supreme Court has held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011); *see Williams v. Stanley*, 581 F. App'x 295, 296 (4th Cir. 2014). Thus, "evidence

---

[23]      In his Reply, Harvey contends that the Circuit Court was wrong to credit trial counsel's "self-serving affidavit" over Harvey's "sworn and specific well-pleaded allegations." (ECF No. 18, at 3.) Harvey's state habeas petition was sworn to, however, once again he merely agreed that "[t]he facts stated in the petition are true to the best of his information and belief." (Hab. Record 4.) The heart of Harvey's state habeas petition was essentially a brief, containing facts, argument, speculation, and hearsay. Simply put, not all of it was entitled to the presumption of truth. *Cf. United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) ("[V]ague and conclusory allegations contained in a [habeas] petition may be disposed of without further investigation by the . . . [c]ourt." (internal quotation marks and citation omitted)).

introduced in federal court has no bearing on § 2254(d)(1) review." *Pinholster*, 563 U.S. at 185.[24]

Here, the Circuit Court found that Harvey failed to demonstrate that counsel rendered ineffective assistance with respect to his failure to find defense witnesses, first, because counsel was not deficient, and second, because Harvey failed to demonstrate any prejudice from counsel's actions. Thus, the Circuit Court adjudicated Harvey's Sixth Amendment claim on the merits. Accordingly, this Court may not consider any new evidence that Harvey has provided for the first time with his § 2254 Petition. *See id.*; *Williams*, 581 F. App'x at 296–97.[25]

---

[24]    Similarly, "under § 2254(d)(2), the court may only grant habeas relief when the state court's factual determination was unreasonable 'in light of the evidence presented in the State court proceeding.'" *Williams*, 581 F. App'x at 297; *see Watkins v. Rubenstein*, 802 F.3d 637, 649 (4th Cir. 2015) (Traxler, C.J., concurring) (citation omitted) (explaining that "[b]y its plain terms, § 2254(d)(2) limits our review to the *evidence* placed before the state [habeas] court").

[25]    The Court recognizes that, in at least one instance, the United States Court of Appeals for the Fourth Circuit has found an exception to the Supreme Court's dictate in *Pinholster* when "a state court forecloses further development of the factual record." *Winston v. Kelly*, 592 F.3d 535, 555 (4th Cir. 2010). The Fourth Circuit explained that "[i]f the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for the purposes of § 2254(d)." *Id.* at 555–56 (citation omitted). However, the Fourth Circuit explained that such a conclusion was appropriate because the petitioner's "inability to produce potentially dispositive evidence in state habeas proceedings came about through no fault of his own." *Winston v. Pearson*, 683 F.3d 489, 501 (4th Cir. 2012). That is not the case here. Although Harvey faults the Circuit Court for not allowing him to obtain discovery and for not holding an evidentiary hearing, truly, the state habeas court did not foreclose further development of the factual record with respect to these alleged witnesses.  Harvey simply did not proffer the statements of these witnesses. Harvey clearly knew the names and contact information for these alleged alibi witnesses and had known this information since before his trial. Therefore, Harvey could have obtained these individuals' statements during his state habeas proceedings without discovery, but he simply failed to do so. Thus, Harvey, through his own lack of diligence, failed to provide these alleged alibi witness statements to the state habeas court.

Moreover, "[a] state court does not unreasonably truncate further factual development when it declines to order discovery of a fact that it finds immaterial." *Valentino v. Clarke*, 972 F.3d 560, 579 (4th Cir. 2020). Because Harvey failed to provide the statements of these alleged alibi witnesses or a proffer of their testimony, the fact that these witnesses may have existed was immaterial, and the Circuit Court found no prejudice from counsel's actions. Once again, Harvey, not the Circuit Court, was the source of any truncation of the record. Thus, "far from a refusal to adjudicate [Harvey's] claim on the merits, the state court's conclusion required it to reject the value of the evidence that [Harvey] offered." *Id.* (some quotation marks omitted). Thus, Harvey's claim

Nevertheless, even if the Court were permitted to consider the new evidence, as explained below, it does not alter the conclusion that Harvey fails to demonstrate any prejudice from counsel's actions.

### b.    Harvey's New Evidence in Support of his Claim Fails to Demonstrate Any Prejudice

Harvey proffers the declarations of four individuals that he claims he told trial counsel could provide alibi testimony. Harvey first offers the Declaration of Rodney Boiling, which indicates that "a minute or two" before the shooting, he saw Harvey walking off the dance floor and in the opposite direction of the shooting. (ECF No. 8–3.) The Court need not review Boiling's statement, because it is not actually signed by Boiling and therefore, was not executed under penalty of perjury and it is not entitled to the presumption of truth.[26] Nevertheless, even considering the content, Boiling only states that he saw Harvey "a minute or two before the shooting" walking off the dance floor. (ECF No. 8–3.)

Harvey offers three other declarations, each of which are signed and sworn to under penalty of perjury. Each declaration is from one of Harvey's first cousins: Rashawn Williams, Shanika Horne, and Brittney Horne. Rashawn Williams indicates that he was at the club the night of the shooting, that he knew Harvey was there but never saw him, and that he was close enough to the shooting that he "got blood on my shoe." (ECF No. 8–6.) Williams states that Harvey "was not near me or the shooting when it happened. I would have seen him." (*Id.*)

Next, Shanika Horne states that she saw Harvey at the club and had spoken with him, but she "had not seen him for more than an[] hour and he was not with us and not near us when the

---

should be evaluated through the lens of § 2254(d), *see id.*, and as discussed above, he fails to show that the Circuit Court's determination was unreasonable.

[26]    Respondent pointed this fact out in their Brief in Support of Motion to Dismiss.  Therefore, Harvey had the opportunity to obtain a sworn copy of this declaration, but did not do so.

gunshots were fired." (ECF No. 8–7.) Horne explains that she "would have known if [Harvey] was near us at the time of the shooting." (*Id.*)

Finally, Brittney Horne, who is also Shanika Horne's sister, indicates that she was on the dance floor with her sister and her cousin, Rashawn Williams, when the victim was shot. (ECF No. 8–8.) Horne saw Harvey, who "was wearing a black bandana to match his black outfit." (*Id.*) Horne had seen and spoken with Harvey that night, "but he was not with us and not near us when the gunshots were fired." (*Id.*) Horne explained that she was confused when the gunshots were fired because the music also had gunshots and "[a]ll of the sudden[, she] saw the body of someone right by my feet almost touching me, we were very close to the shooting." (*Id.*) Horne explains that she "would have known if [Harvey] was near us at the time of the shooting." (*Id.*) Horne also stated that she knew Sherrelle Cheatham and that Sherrelle "was also not near the shooting when it happened." (*Id.*)

The Court finds that each of the declarations, both independently and considered in sum, fail to cast doubt on Harvey as the shooter in light of the totality of the evidence before the jury. As an initial matter, the delay in coming forward with the declarations, together with their content, diminish their value. Presumably, Harvey's first cousins knew he was on trial at the time; however, they failed to come forward with this testimony at the time of the trial. *Cf. Herrera v. Collins*, 506 U.S 390, 423 (1993) (O'Connor, J., concurring) (explaining that affidavits were suspect because there was "no reasonable explanation for the nearly decade-long delay" in producing them). The record before the Court already demonstrates that one potential witness for Harvey appeared the day of trial, however, she was then unable to testify as Harvey wanted. Taken together, these facts raise credibility concerns. More importantly, none of these witnesses testified that they saw the shooter or the shooting. Certainly, no one stated that they saw the shooter and that the shooter was

not Harvey. At most, these witnesses state that they were near the shooting and heard gunshots and that Harvey was not with *them* at the time. However, simply because Harvey was not with them does not eliminate him from being the shooter. Finally, at no point does Harvey, or any other witness, offer who the shooter might have been if it was not him.[27]

In short, these new declarations fail to cast doubt on Harvey as the shooter in light of the totality of the evidence before the jury. The Commonwealth put forth unequivocal eyewitness testimony that Harvey was the shooter. Although the shooting was not captured on video, Sherrelle Cheatham's testimony was otherwise consistent with the video recording of the club. The video showed Harvey leaving the club with a firearm in hand. Although, Harvey testified to his version of the events of the night, the jury weighed his testimony against the Commonwealth's evidence and presumably found his testimony incredible. Therefore, even considering this new evidence, Harvey fails to demonstrate that there is a reasonable probability that, but for counsel's error in failing to have these four alleged alibi witnesses testify at trial, the result of his trial would have been different. Accordingly, Claim Two (d) lacks merit and will be DISMISSED.

---

[27]   Additionally, Harvey faults trial counsel for not contacting several other people from his list including, specifically, Demichael "DY" Billie and Carroll "Cal" Speights.  (ECF No. 8, at 14.) Harvey contends that he "explained the importance of these witnesses to trial counsel." (*Id.*) DY was the individual who tapped BG on the shoulder and gestured for him to step back moments before the victim was shot. Moreover, Harvey and Sherrelle both testified that Cal came to the club and left the club with Harvey. Harvey contends that both he and Cal had armed themselves with firearms because Jerquell and his friends were in the club. If these two witnesses were so important to his defense at trial, it is curious that Harvey has not proffered these individual's statements here, as they were clearly friends with Harvey. If Harvey truly was not the shooter, these individuals could have certainly provided the strongest evidence of Harvey's innocence. However, Harvey has not submitted statements from these individuals or proffered what they may have testified to that would be exculpatory for Harvey. *See Terry*, 366 F.3d at 316; *Bassette*, 915 F.2d at 940-41. As explained by the Circuit Court, for this reason alone, Harvey fails to show any prejudice from trial counsel's failure to contact these other individuals.

## IV.   CONCLUSION

Respondent's Motion to Dismiss (ECF No. 12) will be GRANTED. The § 2254 Petition will be DENIED, and the action will be DISMISSED. A certificate of appealability will be DENIED.

An appropriate Order shall issue.

_____
Elizabeth W. Hanes
United States Magistrate Judge

Date: March 25, 2022
Richmond, Virginia